and we'll hear counsel in Fezzani v. Dweck. Okay, counsel, proceed. Good morning, Your Honor, and may it please the Court, my name is Max Falkenflik, attorney for the plaintiffs. The procedural history and underlying facts of this 20-year-old case are complex, but thankfully the issues before this Court are simple. Did defendants prove, as they were required to in Silotex, that all of the plaintiffs will be unable to prove any damages at trial? No. The answer to that question is clearly no. Defendants did not meet their initial burden. Under Silotex, it proved that any of the plaintiffs would be un- Are you prepared to just go to trial right now? Do you have all the evidence you need? I haven't taken depositions. I haven't gotten a document discovery from defendants. I mean, there was an informal discovery of damages here. Not both. Everybody seemed to agree that the trading losses were the measure, and then the records were never produced. And the plaintiff didn't come up with records, and yet the plaintiffs were involved in the transactions. It seems to me that there's an absence of proof here after the parties tried mightily, I hope, since years were devoted to this aspect of it, to try and establish what the damages would be, because that was a predicate to possible settlement. But then no damages were developed. Your Honor, respectfully, that's both factually wrong as to whether damages were developed. Tell me why. For two reasons. One is there was no bilateral discovery. Two is if we go to trial right now, the evidence before this Court is agreed by both experts that $6.4 million of damages were proven. $6.4 million. You're not pressing the $17 million part? Well, Your Honor, I think I'll try and seek as much damage as I can get, and that $17 million actually, it was $19 and change, was accounted for prejudgment interest as required as a matter of law under New York law, and 9% for each of the 20 years during which these damages were not paid. Now, the question on the $6.4 million that was agreed to, there's no dispute about that. And, in fact, if we follow Your Honor's way of thinking, summary judgment should be entered for the plaintiffs. Those were the records where the trades never left the firm. I mean, the purchases and the sales were always within the firm. The purchases and the sales. That information was before the SIPC trustee? Yes. And, in fact, I have complete printouts from the SIPC trustee, complete printouts of every transaction that took place at A.R. Barron at any of its clearing brokers, 100%. And they were produced. The second factual error, respectfully, Your Honor, in Your Honor's question, is that there was discovery on damages. There was not. And not complete discovery. Third, the defendants did not even look at the documents we produced in April and May of 2015, loaded, scanned, loaded onto a database that they, Mr. Horowitz, my friend, claims to have looked at, but he was in error. And the court, he raised that claim on a reply brief. I moved for rehearing, and the district court denied me the opportunity to submit an affidavit or a declaration proving Mr. Horowitz's error, although I did get on the phone with him and pointed out the fact that he over-misunderstood the records he was looking at. So, leaving aside anything else, let's just look at what their expert said. Their expert said he took a black-box approach to looking at damages in what Judge Winter, on the last appeal before this court, described as a paradigmatic pump-and-dump scheme. Black-box approach doesn't look at any of the purchases or any of the sales. Pump-and-dump schemes rely on misrepresentations and manipulations which inflate the price of specific stocks, not anything in the client's portfolio, but specific stocks. And Mr. Myers agrees. But, correct me if I'm wrong, but it seems to me that maybe you're moving the goalposts here. I thought it was trading losses. Your Honor, trading losses on Barron House stocks. Trading losses on the stocks that were pumped up. Now, some of my clients moved other aspects of their portfolio into Barron, and those stocks might have had losses or made profits, but we're not suing that. I'm not moving the goalposts at all. They are. My claim has always been, as Mr. Myers asserted in his report, the claim has always been that Barron House stocks were manipulated. That claim was recognized by a panel of this court on which Judge Cabrera sat, and was recognized it was a pump-and-dump on particular stocks that were manipulated. It was not a typical broker-dealer trading case. And so what we have here are $6.4 million of losses. That are admitted. Under New York law, profits made at other brokers must be disregarded, and I don't believe there were any on any of these stocks. Under New York law, losses at other brokers must be disregarded. In fact, under New York law, Mr. Myers' black-box approach is entirely unacceptable. Now, we don't just have- I've got another question here. Sure. You're the right guy to ask this, but weren't there two investors in Barron's itself that are affected by this, that are claim-making claims? Two of the clients- Mr. Cong, Mr. Cong, and- Mr. Sung? Sung. Sung, yes. And Mr. Bailey, each invested some money in Barron towards the end because- Are they your clients? They are my clients. They are part of- Okay. But there wasn't anything in the briefing about that to speak of, was there, before the district court? The district court didn't refer to them. The district court didn't refer to them. I respectfully assert that under Celotex, the obligation of the defendant to prove entitlement to judgment as a matter of law would require him to negate that. Those claims were dismissed at summary judgment. Those claims were dismissed, as were the claims for damages on the basis of contested expert testimony. There was no direct advertence to those claims by the district court. Is that correct? Those claims- Yes, they were, Your Honor. But respectfully, Your Honor, on summary judgment, the district court was wrong to sweep out any claims. There was no uncontested evidence that plaintiffs would be unable to prove damages at trial. In fact, there was uncontested evidence that plaintiffs could prove $6.4 million of fraud damages at trial. And under New York law, since fraud is voidable and not void, that's enough. Thank you, Mr. Fogarty. Thank you, Your Honor. You've reserved some time. Mr. Horowitz. Good morning, Your Honors. May it please the Court, Robert Horowitz of Greenberg Trorig for the appellees. As Judge Crotty pointed out, for four years, plaintiffs offered excuses and constantly changing stories as to why their trading records for $17.3 million worth of trading in house stocks were not produced. And Judge Crotty came to the obvious conclusion that without those trading records, any determination of damages based on trading losses, if any, would be entirely speculative, and the jury could not determine what the trading losses were to a reasonable certainty. The two claims that I mentioned, and also the $6.4 million. Yes, Your Honor. Let me start with the $6.4 million. These were the trades, as Your Honor pointed out, related to trades where the records were produced because the purchases and sales occurred at Barron. And they were the ones before the civic trustee. The civic trustee had those. He added trades. Yes, Your Honor, he did. And the law is very clear, and we cited Abrahamson from this court and Mimpico in our brief at page 31, that when the damages result from a single fraud, you can't disregard the gains and just sue for the losses. The law is very clear in that regard, and this was a single wrong. In fact, Mr. Falkenfleck pointed out that this isn't your typical broker case. This was a criminal enterprise where Barron actually underwrote these house stocks, so they became public through Barron. Barron created the market for these stocks, manipulated the market for these stocks, and it was a criminal enterprise. So it doesn't matter where the shares were traded, whether they were traded at Barron or in these other third-party brokerage firms. We don't even know who these third-party brokerage firms are. They were all traded within that criminal market. That impacted the purchase price of the shares. It impacted the selling price of the shares. So to say that we're just going to sue to recover the $6.4 million in disregard, that we may have made $10 million in the other transactions, is not permitted under clear circuit precedent. I think the other point you raised was with regard to the investments. Is that Mr. Sung and the other gentleman? Yes, Your Honor. Bailey? Correct. Sung and Bailey. Your Honor, that's a very curious claim that those people make, because those are the same claims that they've asserted against our clients and alleged that by our clients making investments in Barron, we aided and abetted the fraud. So the bizarre situation, I think that's why nobody ever really paid attention to those claims. Mr. Folkenflik didn't address those claims in his opposition to the motion for summary judgment. Granted, we did not either, but so they . . . For the judges, what do we do about those claims? Forget about them? Nobody here? I mean, I thought your adversary represented those two gentlemen. So I don't . . . He does represent them, but he did not raise it in the court below. That just came up for the first time on appeal. What's the undisputed evidence that there were profits made that thereby preclude claiming? There's undisputed evidence that the trading records are gone for $17.3 million. We have no idea what happened with those . . . Because of the possibility that they will reflect profits, then damages of the 6.4 can't be awarded, is what you're saying? Correct, correct. And a jury cannot . . . Whose burden is that? I'm sorry? Whose burden is that? It's plaintiff's burden to prove their net losses. He argues in his brief that that's a set-off that we would have the burden on, but that's not what the law is. It's a set-off as an independent claim. This is his burden to prove his net losses. And he cannot prove net losses when there's not $17.3 million worth of securities or trading records for $17.3 million worth of securities. This was a manipulated market. Everybody agrees that the prices were wildly fluctuating. There were shares transferred into these accounts that were purchased somewhere else at the very beginning of the period. We have no idea how many shares were purchased, what was paid for them, and then all the shares that were transferred in and out during the fraud. Just out of curiosity, do you have information as to the dates of the trades? No. We have no information whatsoever. Not on one side or the other of those. The ones that were done at Barron, you'd have that information? Yes, yes. But you don't have the other side of those? Correct. Right, when the shares were transferred out. And one of the points I think is I want to make clearly in terms of the plaintiffs arguing a battle of the experts. They didn't use that term here today, but there's two issues with regard to the so-called battle of the experts. And the plaintiff's expert says that it's sufficient to use a mark-to-market approach to calculate trading losses. So for the $17.3 million worth of securities, we can assume that they were purchased the date they were transferred into the account at the market price on that date. And for shares transferred out, we can assume that they were sold on that date at that price. Judge Crotty quite appropriately said that that's an assumption that is just not applicable, particularly in a case where you're talking about 17.3 million shares in a criminal enterprise. So he rejected that as a matter of law. The other so-called battle of the experts, which Mr. Folkenflik referred to earlier, was whether or not, and it's actually a false battle. He says that the defense expert said that in order to calculate the losses, you'd have to do a cash flow analysis. He did not say that at all. What he did is a trade-by-trade analysis and a cash flow analysis. His trade-by-trade analysis covered the $6.4 million worth of trades, the so-called first baron-type securities, and he agreed with the plaintiff's counsel. It basically is to the amount of trading losses with regard to those. He did also, in addition to that, he did a cash flow analysis, but he said with regard to both of them, whether it's trade-by-trade analysis or cash flow analysis, you had to have those trading records from the $17.3 million worth of trades to be able to make any meaningful calculation as to what the trading losses were. And so there was no battle of experts here that would preclude summary judgment. With regard to the discovery, I don't even really understand that argument. We made a decision even before the case came back down to Judge Crotty that we would conduct informal discovery with regard to the trading records. There was no agreement or there was no prohibition on conducting formal discovery with regard to the trading records. We served a document request. These are plaintiff's own trading records. They should have them. If they don't have them, they should be able to get them. Mr. Folkenflik served a subpoena on the SIPC trustee to get those trading records. As I say, we served discovery, a document request to get those trading records. So there was no prohibition on conducting any discovery with regard to the trading records. Is it your client's position that there was no proof whatsoever of damages? There was proof of damages on the matched transactions, but not overall. But you can't—you're saying that because that's an incomplete picture because you don't know about the problem. It's extremely incomplete because it's $17.3 million worth of trades. Doesn't that put us within Celotex anyway? The court commented on pointing to a gap. It's a burden of pointing to a gap in plaintiff's proof on a material issue damage, but holding the plaintiff's quote poorly developed or meager record on damages was still sufficient to get— I'm sorry, Your Honor, I missed— I'm sorry, and I was speaking away. I apologize. That even in Celotex, the court remarked on a poorly developed and meager record on damages but said that was sufficient at least to get to trial. But not when you have $17.3 million worth of records missing. I mean, that's an extraordinary amount, and it's plaintiff's burden to prove net losses. We're never going to be able to go to trial without those trading records and have a jury make a determination to a reasonable certainty as to the amount of trading losses. It would be impossible. It would have to be overturned on appeal if there was a judgment in the plaintiff's favor. Thanks very much. Mr. McCormick has a minute, wishes to be heard. Thank you, Your Honor. May it please the court. I respectfully have nothing further to add to what Mr. Horwitz said, and I'm happy to yield back my time. Thank you. All right, we'll hear from Mr. Fulkenflik. Yes, Your Honor. Let me address a few points. First of all, as a factual matter, my friend Mr. Horwitz misrecalls what happened. We agreed to have discovery solely from the plaintiffs. The defendants did not produce a single document. The defendants did not refuse to produce documents when I requested them informally. Mr. Horwitz's discovery subpoena was rejected on the basis of our agreements. He never brought it up before the court again. Number two, if there are records missing, let's get them. Let's go to those clearing brokers, mostly Bear Stearns. What have you been doing for the last four years? I've been trying to persuade Mr. Horwitz that the proof of $6.4 million that was agreed to gave us a basis for reaching a settlement. Judge Cabranes may not recall, but he suggested when we appeared in April 2011 that given the age of the case, the party should talk about resolution. We talked about resolution. I agree. They kept trying to get all of the documents. Now, the question of what goes before the court, what evidence is admissible, is not the documents in my plaintiff's possession at the beginning of the case, which started five years after they started trading with Barron and three years after Barron was in bankruptcy. Until the reply brief and the reply affidavits, Mr. Myers was mostly talking about stocks traded out of Barron after bankruptcy in 1996. So we were looking at $3.4 million. Most of that $17 million is trading between the various clearing brokers who appeared on the scene from time to time. And so as to that $3.4 million, Mr. Horowitz says that under a Bromison or under the Minapetco case, this is all a single wrong. It isn't. If stocks were pumped and dumped at Barron and transferred to Merrill Lynch, the proper time to value those stocks is at the moment of the transfer. That is standard, standard industry procedure. The black box approach, which the court endorsed and which Mr. Myers proposed, is not standard procedure, is inappropriate, and I think I will probably be able to exclude his evidence under Dobert grounds because it is not designed to capture the losses from the criminal brokers in the pump and dump scheme. Thanks very much. Thank you. We reserve the decision. We appreciate your vigorous arguments.